**ICC INDUSTRIES, INC., ICD Group, Inc., Appellants,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 86–1201.**

United States Court of Appeals, Federal Circuit.

Feb. 11, 1987.

Steven P. Kersner, Brownstein, Zeidman & Schomer, of Washington, D.C., argued for appellants.

J. Kevin Horgan, Commercial Litigation Branch, Dept. of Justice, of Washington, D.C. and Carol McCue Veratti, Office of the General Counsel, U.S. Intern. Trade Com'n, of Washington, D.C., argued for appellee. Also on the brief were Richard K. Willard, Asst. Atty. Gen. and David M. Cohen, Director, Commercial Litigation Branch, Dept. of Justice, of Washington, D.C.

Before RICH, BISSELL and ARCHER, Circuit Judges.

BISSELL, Circuit Judge.

The substantive issues in this case, here on appeal from the judgment of the United States Court of International Trade,[1] are whether:

(1) an importer knew or should have known that it was importing potassi- um permanganate into the United States from the Peoples Republic of China (PRC) at less than fair value, and

(2) a separate injury determination with regard to massive imports during the critical circumstances period must be made by the International Trade Commission (Commission) under 19 U.S.C. § 1673d(b)(4)(A) in order to impose the duty imposed retroactively.

The trial court affirmed the final determination of the International Trade Administration of the Department of Commerce (ITA) that the importers knew or should have known that potassium permanganate was being imported into the United States from the PRC at less than fair value and that the circumstances justified the retroactive imposition of the antidumping duties, i.e., a separate injury determination with regard to massive imports during the critical circumstances period need not be made by the Commission. We affirm.

## BACKGROUND

An antidumping investigation was initiated by both the ITA and the Commission in response to petitions filed concurrently by Carus Chemical Company (Carus) pursuant to 19 U.S.C. § 1673a (1982). The petitions, as amended, alleged that potassium permanganate from the PRC was being imported into and sold in the United States at less than fair value. Carus requested that antidumping duties be imposed on this imported commodity and that critical circumstances be found. A final determination of critical circumstances permits the retroactive imposition of the antidumping duties for the period of 90 days prior to the ITA's preliminary determination. 19 U.S.C. §§ 1673b(e)(2), 1673d(a)(3) (1982). Both the ITA and the Commission made final affirmative determinations in their respective investigations. ICC Industries, Inc. (ICC) and the ICD Group (ICD) (collectively, importers) were respondents in the administrative proceedings. The course of these administrative proceedings follows:

1. The decision is reported at 632 F.Supp. 36 (Ct. Int'l Trade 1986).

| February 22, 1983 | Carus filed petitions with the ITA and the Commission alleging that a domestic industry was being injured as a result of imports of potassium permanganate from the PRC which were being sold in the United States at less than fair value (LTFV). |
| March 3, 1983 | The Commission published its notice of the initiation of preliminary investigation. 48 Fed.Reg. 9091. |
| March 18, 1983 | The ITA published its notice of the initiation of investigation. 48 Fed.Reg. 11481. |
| April 20, 1983 | The Commission published its preliminary determination that there was a reasonable indication that imports of potassium permanganate from the PRC were materially injuring a domestic industry. 48 Fed.Reg. 16977. |
| June 28, 1983 | Carus amended its petition to allege the existence of critical circumstances. |
| August 9, 1983 | The ITA published its preliminary determination that the potassium permanganate from the PRC was being sold in the United States at LTFV. This preliminary determination included an affirmative determination of critical circumstances. 48 Fed.Reg. 36175. The ITA ordered the Customs Service to suspend the liquidation of all entries of potassium permanganate from the PRC made on or after the 90 days before the publication of the ITA's preliminary determination. *Id.* |
| December 29, 1983 | The ITA published its final affirmative determination of sales at LTFV covering potassium permanganate from the PRC. 48 Fed.Reg. 57347. |
| January 25, 1984 | The Commission published its final affirmative injury determination, including a finding that the material injury was by reason of massive imports. 49 Fed.Reg. 3148. |
| January 31, 1984. | The ITA published an antidumping duty order which directed the United States Customs Service to continue to suspend the liquidation of entries of potassium permanganate from the PRC entered on or after the |

date 90 days before the date of the ITA's affirmative preliminary determination. 49 Fed.Reg. 3897–3898.

The period investigated by the Commission in Potassium Permanganate from China included the years 1981 and 1982 and January through August 1983. For the six-month period preceding the initiation of the antidumping investigation, the monthly average for imports of potassium permanganate from the PRC was 21,000 pounds. However, beginning in April 1983 imports of potassium permanganate from the PRC increased. In April 1983, 577,621 pounds were imported; in May 1983, none was imported; in June 1983, 110,892 pounds were imported; in July 1983, 428,132 pounds were imported. The total potassium permanganate imported from the PRC during the period April-July 1983 was 1,116,645 pounds. During the same period of the preceding year, the total was 149,471 pounds.

## OPINION

### A

Title 19 Section 1673d(b)(4)(A) provides: If the finding of the administering authority under subsection (a)(2) of this section is affirmative, then the final determination of the Commission shall include a finding as to whether the material injury is by reason of massive imports described in subsection (a)(3) of this section to an extent that, in order to prevent such material injury from recurring, it is necessary to impose the duty imposed by section 1673 of this title retroactively on those imports.

Subsection (a)(3) referred to in the above quoted text of the code provides that critical circumstances exist if

(A)(i) there is a history of dumping in the United States or elsewhere of the class or kind of merchandise which is the subject of the investigation, or

(ii) the person by whom, or for whose account, the merchandise was imported knew or should have known that the exporter was selling the merchandise

which is the subject of the investigation at less than its fair value, and

(B) there have been massive imports of the merchandise which is the subject of the investigation over a relatively short period.

19 U.S.C. § 1673d(a)(3)(A)–(B) (1982).

 Consequently, in order to retroactively impose the antidumping duty the ITA must initially find that *either* (i), a history of dumping exists *or* (ii), the United States importer knew or should have known that the goods were being imported at less than fair value *and* (iii) massive imports of the merchandise. The importers challenged the ITA's critical circumstances determination by arguing that condition (ii) could not exist. The importers argue that (1) they could not know that the goods were being imported for LTFV because it was impossible to anticipate the ITA's basis for determining fair value, (2) the substantial evidence does not support the existence of condition (ii), and (3) this is contrary to all prior ITA determinations relating to the existence of critical circumstances when the merchandise in question is from a country with a state-controlled economy.[2]

**B**

 We address first whether the importers knew or should have known of the dumping. The antidumping statutes impose a duty when a foreign producer prices the exported merchandise at LTFV and sales of that merchandise cause or threaten to cause material injury to a domestic industry. *See* 19 U.S.C. §§ 1673, 1677b (1982). Fair value is intended to be an estimate of foreign market value. 19 C.F.R. § 353.1 (1983). Fair value can be based on several different factors. *See* 19 C.F.R. §§ 353.3–.9 (1983). "[D]umping is generally defined to exist when the foreign market value is higher than the purchase price in the United States." S.Rep. No. 1298, 93d Cong. 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 7186, 7309. We find unpersuasive the importers' argu-

ment that because the merchandise was imported from a non-market economy (NME) country they could never know that the merchandise is being imported below fair value. The antidumping laws were amended to deal with exports from NME countries. *See* 19 U.S.C. § 164(c) (1976) (repealed 1976) (current version at 19 U.S.C. § 1677b (1982)); *see generally Georgetown Steel Corp. v. United States,* 801 F.2d 1308, 1316–17 (Fed.Cir.1986) (discussion of the adoption of use of surrogate country method for determining whether imports from NME countries were being dumped).

When the ITA investigates to determine whether dumping has occurred with goods from market economy countries, and if so, to what level, it compares each price at which the merchandise entered into the United States market with the foreign producers' average home-market price. *See* 19 C.F.R. § 353.20–.28 (1983). In order to have a common basis for this comparison, the ITA calculates the price of the merchandise at the factory door of the foreign producer and converts the home market price into United States dollars. 19 U.S.C. §§ 1677a (c), (d), 1677b(a)(1) (1982); 19 C.F.R. §§ 353.3, 353.9 (1983); *see Smith-Corona Group v. United States,* 713 F.2d 1568, 1571–73, 1 Fed.Cir. (T) 130, 132–33 (1983). The level of dumping is determined on the basis of the excess of the foreign market value of the merchandise in the country of production over the selling price for the merchandise in the United States. 19 U.S.C. § 1673 (1982); *Consumer Products Div., SCM Corp. v. Silver Reed America, Inc.,* 753 F.2d 1033, 3 Fed.Cir. (T) 83 (1985).

 When this analysis is applied to goods from NME countries, there is no home market price to which the United States price can be compared. Home market prices and costs are meaningless as a source of "fair value" in NME countries in view of the level of intervention by the government in setting relative prices. *See*

2. We recognize the fact that the trade laws do not provide an easy definition of a non-market economy country. Fortunately, this is not at issue in this case. *See* 19 U.S.C. § 1677b(c) (1982) ("state controlled"); 19 U.S.C. § 2436(c) (1982) ("communist").

Horlick & Shuman, *Nonmarket Economy Trade and U.S. Antidumping/Countervailing Duty Laws,* 18 Int'l Law. 807, 818 (1984) [hereinafter, Horlick & Shuman]. Consequently, the statute requires the ITA to identify "surrogate" producers [3] in market economy countries and to compare the prices of the NME country's imports to the prices charged by the surrogate. 19 U.S.C. § 1677b(c)(1) (1982). While the surrogate country method of determining whether dumping exists has received criticism, Congress did not adopt this method blindly. By enacting this subsection, Congress adopted the then existing Treasury regulations. *See* S.Rep. No. 1298, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 7186, 7311; Ehrenhaft, The Treasury's Proposed Approach to Imports From State-Controlled Economy Countries and State-Owned Enterprises Under the Antidumping and Countervailing Duty Laws, *reprinted in* Interface One: *Conference Proceedings on the Application of U.S. Antidumping and Countervailing Duty Laws to Imports From State-Controlled Economies and State-Owned Enterprises* 75, 80–85 (D. Wallace, G. Spina, R. Rawson & B. McGill, eds. 1980); Horlick & Shuman, *supra,* at 810.

 While the uncertainty of not knowing which country will be chosen by the ITA as the surrogate country is seemingly unfair to an importer of goods from NME countries, this is but one criticism of the statute and is not enough to exempt the importers from the reach of the statute.

Consequently, the question becomes whether the evidence in the administrative record could have reasonably led to the ITA's conclusion that the importers of potassium permanganate knew or should

have known that the imports were being sold at less than fair value during the period that the dumping investigation was proceeding. *See Matsushita Electric Industrial Co. Ltd. v. United States,* 750 F.2d 927, 933, 3 Fed.Cir.(T) 44, 51 (1984) ("[T]he question is whether there was evidence which could reasonably lead to the Commission's conclusion, that is, does the administrative record contain substantial evidence to support it and was it a rational decision?").

The importers assert that they did not know the price of potassium permanganate in the PRC. Notwithstanding, these importers averred to the "competitive" nature of the prices at which they purchased potassium permanganate and, in fact, knew the prices of this merchandise in Europe and the United States. The importers knew that:

(1) Spain [4] and the PRC were the primary sources other than Carus of this product in the United States. 48 Fed.Reg. 57347 (December 29, 1983);

(2) Spain is not a state controlled economy country. *Id.;*

(3) during the period of March-July, 1983, the unit price of potassium permanganate was 22% less than that imported from Spain and nearly 40% less than the price of the domestic product. *Id.;*

(4) although the potassium permanganate from Spain was a different quality grade than that from the PRC, it was found to be priced similarly during the period of 1981–82 and the two quality grades were interchangeable;

(5) most of the imports comprising the surge which led to ITA's affirmative critical circumstances determination

---

**3.** The statute also provides that fair value may be construed by determining the constructed value. 19 U.S.C. § 1677b(c)(2) (1982); *see* 19 C.F.R. § 353.6 (1983). ITA regulations provide, however, that the first preferred method of determining fair value is by determining the price at which similar merchandise produced in a non-state-controlled-economy country is sold. 19 C.F.R. § 353.8(a)(1) (1983). The *importers do not* argue that a "constructed value" analysis should have been used in place of a "surrogate country" analysis.

**4.** We find the importers' argument that Spain should not have been used as the surrogate country in the ITA's final determination unpersuasive, since it was they who argued that Spain should have been used in the ITA's preliminary determination. Furthermore, the issue of whether one country may be used for the preliminary determination and another for the final determination was not raised by the parties and is not addressed.

were the result of orders placed after the initiation of the antidumping duty investigation; and

(6) these importers were on notice of the pendency of the investigation. *See* 48 Fed.Reg. 9091 (March 3, 1983); 48 Fed.Reg. 11481 (March 18, 1983).

■ This level of underselling, in this commercial environment, while under this administrative scrutiny, is sufficient to support the ITA's conclusion that these importers should have known that they were importing potassium permanganate at LTFV. Since importers have failed to point to any legal error in ITA's estimate of foreign market value, we hold that the conclusion reached by the ITA and affirmed by the trial court is supported by substantial evidence. 19 U.S.C. §§ 1516a(a)(2)(B)(i), 1516a(b)(1)(B) (1982); *see Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 2 Fed.Cir.(T) 130 (1984) (judicial review of a final material injury determination under the substantial evidence standard); *SSIH Equipment S.A. v. ITC,* 718 F.2d 365, 1 Fed.Cir.(T) 90 (1983) (Section 337 actions reviewed under the substantial evidence test); *compare Matsushita Electric Industrial Co., Ltd. v. United States,* 750 F.2d at 933, 3 Fed.Cir.(T) at 51 (In reversing the trial court that reversed the ITC in an injury determination, this court stated "[s]ubstantial evidence 'is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" (Citations omitted)).

### C

With regard to the issue of whether the critical circumstances provision requires the Commission to make a separate finding that the massive imports found to exist during the critical circumstances period were a discrete cause of material injury to the domestic industry, we find no error in the trial court's judgment affirming the Commission's interpretation of the statute. Importers argue that because section 1673d(b)(1)(A)(i) uses the word "shall," Congress directed the Commission to make a separate, additional causation determination with respect to the massive imports found by the ITA. Under the importers' interpretation of the statute, the Commission makes one material injury determination under section 1673d(b)(1)(A)(i) and a second, separate material injury determination under section 1673d(b)(4)(A). Although this may be one of the possible interpretations, it is not the interpretation made by the Commission.

An agency's interpretation of a statute which it is authorized to administer is "to be sustained unless unreasonable and plainly inconsistent with the statute, and [is] to be held valid unless weighty reasons require otherwise." *Melamine Chemicals, Inc. v. United States,* 732 F.2d 924, 928, 2 Fed.Cir.(T) 56, 60–61 (1984) (regulations implementing a statute); *see Young v. Community Nutrition Institute,* — U.S. —, 106 S.Ct. 2360, 2364, 90 L.Ed.2d 959 (1986); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 n. 11, 104 S.Ct. 2778, 2782 n. 11, 81 L.Ed.2d 694 (1984); *Zenith Radio Corp. v. United States,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978); *American Lamb Co. v. United States,* 785 F.2d 994, (Fed.Cir.1986); *Consumer Products Div., SCM Corp. v. Silver Reed America, Inc.,* 753 F.2d 1033, 3 Fed.Cir.(T) 83 (1985). An agency's "interpretation of the statute need not be the *only* reasonable interpretation or the one which the court views as the most reasonable." *Consumer Products,* 753 F.2d at 1039, 3 Fed.Cir.(T) at 90 (emphasis in original).

Legislative history indicates that the critical circumstances provision was enacted to provide meaningful relief to domestic industries, while achieving another objective of the 1979 revision to the antidumping duty law, *i.e,* to reduce the length of time for an investigation. S.Rep. No. 249, 96th Cong., 1st Sess. 66, *reprinted in* 1979 U.S. Code Cong. & Admin.News 381, 452–53. The provision was

designed to provide prompt relief to domestic industries suffering from large volumes of, or a surge over a short peri-

od of, imports and to deter exporters whose merchandise is subject to an investigation from circumventing the intent of the law by increasing their exports to the United States during the period between initiation of an investigation and a preliminary determination by the [ITA].

H.Rep. No. 317, 96th Cong. 1st Sess. 63, 1979 U.S.Code Cong. & Admin.News 449 (1979).

■ In reaching the final determination in the antidumping investigation in which critical circumstance is at issue, the Commission must make a determination that the imports, including the massive imports, of the merchandise, here potassium permanganate, are the cause of material injury, 19 U.S.C. § 1673d(b)(1) (1982), before the question of critical circumstances is addressed. It is reasonable to interpret the antidumping duty statute as requiring one material injury finding to be used in both 19 U.S.C. § 1673d(b)(4)(A) (the critical circumstances provision) and 19 U.S.C. § 1673d(b)(1)(A)(i) (the final determination provision). Identical words used twice in the same act are presumed to have the same meaning. 2A Sutherland Statutory Construction § 46.06 (4th ed. 1984); *see United States v. Nunez*, 573 F.2d 769, 771 (2d Cir.1978) ("for such period"); *Meyer v. United States*, 175 F.2d 45, 47 (2d Cir.1949) ("ordinary and necessary"). The Commission's interpretation is consistent with the congressional goal of providing meaningful relief to the domestic industries under the time limitations within which a final determination must be made. *See* 19 U.S.C. § 1673d(a), (b) (1982). The imposition of retroactive antidumping duties is to prevent the injury from recurring or continuing and inhibits injury by importers who attempt to circumvent the antidumping laws by shipping in massive imports after an antidumping petition is filed with the Commission and the ITA but before suspension of liquidation can occur. Consequently, the judgment of the Court of International Trade is affirmed.

AFFIRMED.