v.

UNITED STATES, Defendant,

Hyster Co., a.k.a., NACCO Materials
Handling Group, Inc.,[1] et al.,
Defendant–Intervenors.

Slip Op. 94–33.
Court No. 92–03–00134.

United States Court of
International Trade.

March 1, 1994.

### JUDGMENT

CARMAN, Judge.

### *ORDER*

HYSTER CO., a.k.a., NACCO Materials Handling Group Inc., Independent Lift Truck Builders Union, International Assoc. of Machinists and Aerospace Workers, International Union, Allied Industrial Workers of America (AFL–CIO), and United Shop and Service Employees, Plaintiffs,

v.

UNITED STATES, Defendant,

and

Nissan Motor Co., Ltd., et al., Toyota Motor Sales, U.S.A., Inc., and Toyo Umpanki Co., Ltd., Defendant–Intervenors.

Court No. 92–03–00133.

United States Court of
International Trade.

March 1, 1994.

---

**1.** Subsequent to remand, defendant-intervenor changed its name from Hyster Co. to NACCO     Materials Handling Group, Inc.

Collier, Shannon, Rill & Scott, Paul C. Rosenthal, Mary T. Staley and David C. Smith, Jr., Washington, DC, for plaintiffs.

· Frank W. Hunger, Asst. Atty. Gen., David Cohen, Director, Civ. Div., Commercial Litigation Branch, U.S. Dept. of Justice (Jeffrey M. Telep), Patrick Gallagher, Atty.–Advisor, Office of the Deputy Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC, of Counsel, for defendant.

Arnold & Porter, Lawrence A. Schneider and Susan T. Morita, Washington, DC, for defendant-intervenors Nissan Motor Co. et al.

Dorsey & Whitney, John B. Rehm, Munford Page Hall, II and L. Daniel Mullaney, Washington, DC, for defendant-intervenor Toyota Motor Sales, U.S.A., Inc.

O'Melveny & Myers, Greyson Bryan, Craig L. McKee and Bruce Hirsh, Los Angeles, CA, for defendant-intervenor Toyo Umpanki Co., Ltd.

## OPINION

CARMAN, Judge:

Plaintiffs move for judgment upon the agency record pursuant to Rule 56.1 of this Court. Plaintiffs contest the Department of Commerce's final results in *Certain Internal–Combustion, Industrial Forklift Trucks from Japan; Final Results of Antidumping Duty Administrative Review,* 57 Fed.Reg. 3167 (1992) (*Final Results* ). The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (1988).

## BACKGROUND

Plaintiffs (NACCO Materials Handling Group, Inc.,[1] Independent Lift Truck Builders Union, International Association of Machinists and Aerospace Workers, International Union, Allied Industrial Workers of America (AFL–CIO), and United Shop and Service Employees (collectively "NACCO")) are a U.S. manufacturer of internal-combustion, industrial forklift trucks, and domestic unions representing workers who are engaged in the manufacture of internal-combustion, industrial forklift trucks in the U.S. The three defendant-intervenors, Nissan,[2] Toyota, and Toyo, are manufacturers/exporters of the internal-combustion, industrial forklift trucks from Japan under review.

Commerce published an antidumping duty order covering certain internal-combustion forklift trucks from Japan on June 7, 1988, and a notice of an initiation of administrative review of the antidumping duty order on July 25, 1989. *See Antidumping Duty Order and Amendment to Final Determination of Sales at Less Than Fair Value; Certain Industrial Internal–Combustion Forklift Trucks from Japan,* 53 Fed.Reg. 20,882 (1988); *Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 54 Fed.Reg. 30,915 (1989). The review covered the period of November 24, 1987 through May 31, 1989. *Id.*

After comparing U.S. price (USP) to foreign market value (FMV), Commerce determined that the following margins existed for the review period: Toyota 12.22%,[3] Nissan 7.36%, and Toyo 7.71%.[4] *Final Results,* 57 Fed.Reg. at 3183–84. Commerce published the preliminary results of its review on May 23, 1991. *Certain Internal–Combustion, Industrial Forklift Trucks from Japan; Preliminary Results of Antidumping Duty Administrative Review,* 56 Fed.Reg. 23,675 (1991). Commerce published the final results of its administrative review on January 28, 1992. *Final Results,* 57 Fed.Reg. at 3167.

On August 6, 1993, this Court remanded the final results to Commerce with respect to Commerce's failure to account for Toyota's U.S. direct advertising expenses.. *Hyster Co. v. United States* (Remand Order, Aug. 6, 1993). On remand, Commerce accounted for Toyota's U.S. direct advertising expenses, but despite the changes made in its analysis, Toyota's dumping margin did not change. *Id.* at 4.

## CONTENTIONS OF THE PARTIES

NACCO argues the Court should grant a remand and order Commerce to (1) eliminate its original adjustment to USP and FMV to account for the Japanese consumption tax; (2) match U.S. sales with the most similar home market sales; (3) reject Nissan's, Toyota's and Toyo's transfer prices as a basis for cost; (4) recalculate Nissan's and Toyota's value-added expenses; (5) disallow an adjustment for rebates given by Nissan; (6) correct the errors in Toyo's database; and (7) recalculate Toyota's U.S. labor and product liability expenses.[5]

---

**1.** During the course of this litigation, plaintiff changed its name from Hyster Co. to NACCO Materials Handling Group, Inc.

**2.** Defendant–Intervenors Nissan Motor Co., Ltd., Nissan Industrial Equipment Corp. and Barrett Industrial Trucks, Inc. will be referred to collectively as "Nissan."

**3.** In a separate action before this Court, Toyo and Toyota contested certain aspects of Commerce's final determination. *Toyota Motor Sales, USA, Inc. v. United States,* 829 F.Supp. 1364. The Court remanded *Toyota* and after the completion of the remand, Commerce determined Toyota's margin to be 12.02%. *See* 17 CIT ——, 829 F.Supp. 1364 (1993); *Final Results of Redetermination Pursuant to Court Remand, Toyota Motor Sales, USA, Inc. v. United States,* Court No. 92–03–00134, Court Order (July 23, 1993) at 4.

**4.** Commerce also determined a margin of 39.-15% existed for Mitsubishi Heavy Industries (MHI). MHI, however, is not a party to the instant action.

**5.** Plaintiffs also argue in their briefs that Commerce's failure to account for Toyota's U.S. direct advertising expenses was not in accordance with law. This point, however, is no longer in issue because on August 6, 1993, the Court ordered a remand with respect to Toyota's U.S. direct advertising expenses and none of the parties contested Commerce's remand determination. *See Final Results of Redetermination Pursuant to Court Remand Hyster Co. v. United States* (1993).

Commerce contends its determination is based upon substantial evidence on the record and is otherwise in accordance with law except with respect to the circumstance of sale adjustment made for the Japanese consumption tax and its failure to correct errors in Toyo's database. Commerce argues the Court should remand the case directing it (1) to correct errors in Toyo's database and (2) to delete the circumstance of sale adjustment. Commerce requests the Court to affirm its final results in all other respects.

Defendant–Intervenors maintain plaintiffs' arguments are without merit. Nissan, Toyota and Toyo argue the aspects of the final results plaintiffs challenge are supported by substantial evidence on the record and are otherwise in accordance with law.

STANDARD OF REVIEW

In an action challenging Commerce's final results, this Court must decide whether Commerce's determination is supported by substantial evidence on the record and is otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988). "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." *Ceramica Regiomontana S.A. v. United States*, 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986), *aff'd*, 5 Fed.Cir. (T) 77, 810 F.2d 1137 (1987) (citations omitted).

■ The Court must accord substantial weight to the agency's interpretation of the statute it administers. *American Lamb Co. v. United States*, 4 Fed.Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986) (citations omitted). "An agency's 'interpretation of the statute need not be the *only* reasonable interpretation or the one which the court views as the most reasonable.'" *ICC Indus., Inc. v. United States*, 5 Fed.Cir. (T) 78, 85, 812 F.2d 694, 699 (1987) (emphasis in original) (citation omitted) (*ICC Indus.*).

DISCUSSION

A. *Japanese Consumption Tax*

1. Tax Pass Through

■ To prevent dumping margins from arising because the country of exportation assesses certain taxes on home market sales but not on export sales, the antidumping law provides for an offsetting adjustment in the calculation of United States price. The relevant statute provides as follows:

**(d) Adjustments to purchase price and exporter's sales price.**—The purchase price and the exporter's sales price shall be adjusted by being—

(1) increased by—

.    .    .    .    .    .    .

(C) the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation....    .

19 U.S.C. § 1677a(d)(1)(C) (1988).

Plaintiffs claim Commerce has violated 19 U.S.C. § 1677a(d)(1)(C) by assuming the Japanese consumption tax was completely passed through to consumers. Plaintiffs argue there is no evidence on the record supporting the conclusion the tax was completely passed through. Plaintiffs request the Court, therefore, to remand this issue to Commerce with directions to assume none of the tax was passed through to consumers and eliminate the adjustment made to USP.

Commerce argues 19 U.S.C. § 1677a(d)(1)(C) does not require it to measure the consumer tax incidence of the Japanese tax. Commerce claims Congress never intended it to conduct an econometric study of consumer tax incidence in every antidumping case involving refunded home market taxes. The burden on its time and resources would be enormous, according to Commerce, if it were required to conduct such econometric studies.

Defendant–Intervenors maintain a tax pass through analysis is unnecessary. Toyota and Nissan argue Commerce correctly accounted for the Japanese consumption tax in adjusting USP. They maintain evidence on the

record demonstrates they passed the consumption tax through to their respective home market customers. Toyo argues a tax pass through analysis is not necessary because the forklift truck market is a competitive market. Toyo claims a consumption tax is passed entirely to consumers in a competitive market. Defendant–Intervenors claim, therefore, they are entitled to an upward adjustment to USP even if the Court accepts plaintiffs' reading of the law.

Subsequent to oral argument in this case, the Court of Appeals for the Federal Circuit (CAFC) issued an opinion dealing directly with the issue of whether 19 U.S.C. § 1677a(d)(1)(C) requires Commerce to measure consumer tax incidence. *Daewoo Elecs. Co. v. International Union,* 11 Fed.Cir. (T) ——, 6 F.3d 1511 (1993). The Court of International Trade (CIT) had held § 1677a(d)(1)(C) compelled Commerce to analyze the consumer tax incidence of the taxes. *Daewoo Elecs. Co. v. United States,* 13 CIT 253, 712 F.Supp. 931 (1989). Commerce appealed to the CAFC arguing the statute only required it to examine the "customary business records of exporters." *Daewoo,* 11 Fed.Cir. at ——, 6 F.3d at 1516. According to Commerce,

> [i]f an exporter's records show that a tax was either a separate "add on" to the domestic price, or although not separately stated, was, in fact, included in the price and that the taxes were paid to the government, that satisfies the tax inquiry required by the statute for an adjustment of the USP.

*Id.* at ——, 6 F.3d at 1516–17. Instead of being compelled to conduct an econometric study, Commerce maintained it need only employ an accounting approach. *Id.* at ——, 6 F.3d at 1514. The CAFC reversed the CIT on this issue holding Commerce's interpretation of the statute to be a reasonable one. *Id.* at ——, 6 F.3d at 1517.

■ Based on the CAFC's decision in *Daewoo,* this Court holds Commerce is not required to conduct a test of consumer tax incidence. Plaintiffs' argument that the Court must order Commerce to assume no consumer tax incidence fails. The issue remains, however, whether Commerce has sat-

isfied the standard set out by the CAFC: did Commerce examine the exporters' records and based on substantial evidence on the administrative record determine the Japanese consumption tax was included in the price.

Evidence on the record demonstrates Commerce verified through defendant-intervenors' business records the fact the defendant-intervenors included the three percent Japanese consumption tax in the price of the merchandise sold in the home market. Commerce examined in detail documentation supporting eleven Toyota home market sales. AR 17 at 238A. Among the documentation examined were Toyota's financials which indicated the three percent Japanese consumption tax was included in the listed transactions. AR 24 at 139A. Similarly, Commerce's examination of Nissan's financials indicated Nissan included the consumption tax in the price. AR 38 at 15. Commerce also examined a sample sale of Toyo's and concluded the company included the three percent consumption tax in the total price of the truck. AR 134 at 260A. Based on the substantial evidence on the record, the Court holds Commerce has satisfied the standard established by the CAFC. Plaintiffs' motion, therefore, fails with respect to this issue.

### 2. Multiplier Effect

■ In its investigation, Commerce calculated the amount of commodity tax not collected on the export sales and added it to USP. Commerce then made a circumstance of sale adjustment to FMV for the differences in taxes in each market. *Final Results,* 57 Fed.Reg. at 3183. Subsequent to Commerce's final results, the CAFC issued *Zenith Elecs. Corp. v. United States,* 11 Fed. Cir. (T) ——, 988 F.2d 1573 (1993). *Zenith* held 19 U.S.C. § 1677a(d)(1)(C) "does not provide for any adjustment to FMV to correct for tax-related distortion of the dumping margin." *Id.* at ——, 988 F.2d at 1580. Because *Zenith* precludes it from using the circumstance of sale statutory provision to account for the "multiplier effect" caused by the consumption tax, Commerce requests the Court to remand this issue for Commerce to make the necessary corrections.

Toyota and Nissan agree *Zenith* prevents Commerce from using the circumstance of sale adjustment in 19 U.S.C. § 1677b(a)(4)(B) (1988) to avoid multiplier effect distortions. Toyota and Nissan, however, argue *Zenith* permits Commerce to eliminate the multiplier effect by adjusting USP by the amount, instead of the rate of the *ad valorem* tax. According to defendant-intervenors, distortions to Commerce's calculation of dumping margins will result if an adjustment is not made.

Plaintiffs agree with Commerce that this case should be remanded to eliminate the circumstance of sale adjustment which *Zenith* held to be unlawful. Plaintiffs, however, claim defendant-intervenors' request to adjust FMV or USP on remand to account for the multiplier effect caused by the consumption tax is unlawful.

Commerce argued in *Zenith* it was necessary to use a circumstance of sale adjustment to lower the FMV amounts to avoid artificially inflating dumping margins. *Id.* at ——, 988 F.2d at 1578. The CAFC held title 19 permits Commerce to make tax adjustments only to USP, not to FMV. *Id.* at ——, 988 F.2d at 1580. The CAFC pointed out the legislative history of 19 U.S.C. § 1677a(d)(1)(C) "does not suggest Congress sought tax neutrality when it fashioned the adjustment provision." *Id.* at ——, 988 F.2d at 1582. The court, however, added a suggested method of eradicating the multiplier effect:

> "[Section 1677a(d)(1)(C)] by its express terms allows adjustment of USP in the *amount* of taxes on the merchandise sold in the country of exportation. While perhaps cumbersome, Commerce may eliminate the multiplier effect by adjusting USP by the amount, instead of the rate, of the *ad valorem* tax."

*Id.* at ——, 988 F.2d at 1582 n. 4 (emphasis in original).

■ Pursuant to *Zenith* and title 19, this Court holds Commerce may not use a circumstance of sale adjustment to compute commodity tax adjustments. The Court remands this issue to Commerce for it to eliminate the use of 19 U.S.C. § 1677b(a)(4)(B) in accounting for the "multiplier effect." Additionally, because 19 U.S.C. § 1677a(d)(1)(C) permits Commerce to adjust USP by the amount of the *ad valorem* tax, the Court directs Commerce to consider any further adjustments to USP consistent with *Zenith* and title 19.

## B. *Model Match Methodology*

■ Where there were no identical products sold in the home market, Commerce developed a model match procedure based on a point system of selected forklift characteristics to determine which models of forklifts sold in Japan it should compare with models sold in the United States. *Final Results,* 57 Fed.Reg. at 3167. This model match methodology, which differed from that used in the original investigation, was announced by Commerce after it considered the comments received from petitioner and all of the respondents. Commerce made product comparisons based on load capacity and six primary characteristics to which it had assigned points indicative of each characteristic's relative importance. *Id.* The six characteristics and their respective point values are as follows: tire type, six points; upright style, five points; engine type, four points; transmission type, three points; maximum forklift height, two points; and engine size, one point. *Id.* U.S. models with the same or most similar number of points as the home market models were considered to be the most similar merchandise.

Plaintiffs argue Commerce erroneously changed its methodology to obtain the most matches, rather than the most similar matches, of home market sales. NACCO maintains Commerce's goal of obtaining a higher volume of market sales for comparison purposes violated 19 U.S.C. § 1677(16) (1988) and 19 U.S.C. § 1677b(a)(1). Plaintiffs contend tire type should be the predominant characteristic in the model match methodology. According to plaintiffs, the tire type affects the entire frame structure of the truck, and it is the frame which is the single most important characteristic of a forklift truck. Plaintiffs claim that "[a]s long as the Department has found that the home market constitutes a viable market pursuant to 19 U.S.C. §.1677(17) and 19 C.F.R. § 353.48,

the number of home market sales used to match models should not play a role in the model match process." Plaintiffs' Reply at 9 (footnote omitted).

Commerce argues it changed its model match methodology "to preserve the single-most important characteristic, load capacity, to negate the 'veto' that tire type had over potential matches and to ensure the most similar matches by basing selection upon seven characteristics." Defendant's Brief at 27. Commerce points out tire type is the most important characteristic in its revised methodology, but does not have the disproportionate weight it had in the original investigation. Toyota, Toyo and Nissan argue Commerce correctly selected the most similar forklifts sold in Japan as the basis for determining FMV.

In determining FMV, Commerce must base its valuation on the price of "such or similar merchandise" sold in the home market. 19 U.S.C. § 1677b(a)(1)(A). "Such or similar merchandise" is defined in relevant part as follows:

> merchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:
>
> (A) The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.
>
> (B) Merchandise—
> (i) produced in the same country and by the same person as the merchandise which is the subject of the investigation,
> (ii) like that merchandise in component material or materials and in the purposes for which used, and
> (iii) approximately equal in commercial value to that merchandise.

19 U.S.C. § 1677(16). Because there was not merchandise sold in the home market identical to that sold in the United States, Commerce properly relied on 19 U.S.C. § 1677(16)(B).

Commerce has broad discretion in choosing a methodology to carry out its statutory mandate. *NTN Bearing Corp. v. United States,* 14 CIT 623, 633, 747 F.Supp. 726, 736 (1990) (*NTN*). Even if another alternative is more reasonable, Commerce has acted within its authority if its decision is reasonable. *ICC Indus.,* 5 Fed.Cir. (T) at 85, 812 F.2d at 699. In the underlying investigation of *NTN,* Commerce declined to adopt the methodology proposed by plaintiffs. The *NTN* Court held Commerce had considered suggestions from the interested parties before adopting a methodology and had provided reasonable explanations for the methodology it ultimately chose. *NTN,* 14 CIT at 634, 747 F.Supp. at 736. The Court stated plaintiffs had not provided any evidence of unreasonable behavior on Commerce's part. Plaintiffs thus failed to demonstrate Commerce's determination was not supported by substantial evidence. *Id.* at 633, 747 F.Supp. at 736.

Just as it did in the underlying investigation in *NTN,* Commerce solicited and considered comments from all of the parties concerning the model match methodology to be used. Similar to the *NTN* plaintiffs, plaintiffs in the instant action have failed to provide any evidence of Commerce's alleged unreasonable behavior. As Commerce noted in its final results, "[plaintiffs] failed to provide any specific examples regarding widespread, or even episodic, matches of dissimilar merchandise. Without such evidentiary support for their position, the Department can neither evaluate [plaintiffs'] claim nor reasonably alter its existing matching procedure." *Final Results,* 57 Fed.Reg. at 3183. While plaintiffs make sweeping allegations concerning the model match methodology, they do not provide the Court with specific examples of why Commerce's model match methodology is unlawful.

In support of their contention that Commerce's choice of model match methodology is contrary to law, plaintiffs cite the following language contained in a July 3, 1989 Commerce memo discussing its model match methodology: "Our main concern is that we find the most similar merchandise that is sold in commercial quantities in the home market.... This approach appears to be a reasonable solution in that it simplifies the

matching process and creates the likelihood of a greater number of matches." AR 23 at 166. The Court, however, fails to see how this language proves Commerce was only interested in increasing the number of matches as plaintiffs aver. The first sentence of this quote merely tracks the language of 19 U.S.C. § 1677b(a)(1)(A) which requires Commerce to base FMV on "such or similar merchandise" sold in the home market "in the usual commercial quantities." 19 U.S.C. § 1677b(a)(1)(A). Commerce is therefore saying that its main concern is following its statutory mandate.

Similarly, the second sentence provides no support to plaintiffs' argument. Simply because Commerce's model match methodology had the potential of resulting in a greater number of matches does not prove this was Commerce's sole motive in changing its methodology. A careful reading of the entire document cited by plaintiffs, in fact, demonstrates this was not Commerce's motive. Commerce provided reasonable explanations for the change which were based on what Commerce learned in the investigation. Commerce was interested in finding a methodology that would not only negate the veto effect the tire type had played in the earlier methodology, but that would also categorize the merchandise along current industry standards. AR 23 at 166–67. Accordingly, this Court sustains Commerce's choice of model match methodology and "such or similar merchandise" determination.

## C. *Transfer Prices*

Plaintiffs argue Commerce accepted respondents' claims that their related party transfer prices were at arm's length without requiring the respondents to submit substantial evidence in support of these claims. NACCO contends Commerce unlawfully allowed respondents to " 'create' their own methodologies and procedures for reporting their data." Plaintiffs' Brief (Pl.Br.) at 22. Plaintiffs ask this Court to remand the issue to Commerce with instructions either to obtain proper data from the respondents or base its determination on best information available (BIA).

Commerce maintains it properly relied upon the transfer prices the respective respondents paid to their related suppliers. Transactions between related parties, Commerce contends, need only be disregarded if the transfer prices do not reflect fair market value. *See* 19 C.F.R. § 353.45(a) (1992).

### 1. Nissan

■ With respect to Nissan, plaintiffs claim Commerce unlawfully permitted Nissan to submit its value-added data on an averaged basis rather than on a sale-by-sale basis. Plaintiffs contend Commerce should have compared Nissan's transfer prices with its related-suppliers' cost of production on a component by component basis rather than on an aggregated basis. Moreover, plaintiffs argue Commerce should not have allowed Nissan to select the home market and U.S. models it used to demonstrate its transfer prices were at arm's length. According to plaintiffs, Commerce violated 19 U.S.C. § 1677a(c) by relying on transfer prices to calculate Nissan's cost of production and value-added expenses.

Commerce avers it properly relied on Nissan's transfer prices because Nissan demonstrated the prices represented arm's length transactions. Furthermore, Commerce argues, there is no evidence on the record suggesting the transfer prices are unrepresentative of market prices. Nissan contends Commerce's use of Nissan's related party transfer prices is not only supported by substantial evidence on the record, but is consistent with Commerce's past practice. According to Nissan, "it would be almost impossible to use actual cost of production for parts supplied by Nissan's related suppliers for each individual forklift truck because it does not have a bill of materials for each forklift truck and constructing one would be a time consuming task." *Final Results*, 57 Fed. Reg. at 3173. In order to demonstrate its related supplier transfer prices were arm's length transactions, Nissan purported to show these prices were in the aggregate higher than the unrelated suppliers' cost of production. *Id.* at 3174.

Contrary to plaintiffs' assertions, Commerce may use related party transactions

provided the transactions are arm's length in nature. *See* 19 C.F.R. § 353.45. Commerce, however, must be able to establish the transactions were arm's length based on substantial evidence on the record. Nissan supplied Commerce with documentation which compared the standard costs in calculating Nissan's cost of production to Nissan's related suppliers' cost of production. Conf.Doc. 71 at 2521A–22A, 2621A–45A. Additionally, Nissan submitted information regarding the prices at which Nissan's related suppliers sold their products to third parties. Conf. Doc. 19 at E–20 and Appendices E.VI.B.3 and E.VI.B.5. Nissan also provided bills of material for representative forklift models. Conf.Doc. 19, Appendix E.VI.B.5 at 368A–389A.

Based on a careful examination of the record, the Court must conclude Commerce's determination to use Nissan's related party transfer prices is not based on substantial evidence on the record. Nissan supplied Commerce with cost information for related suppliers which indicates Nissan purchased a significant number of items [      .] Conf. Doc. 19, Appendix E.VI.B.3. When Commerce received this information it had "reasonable grounds to believe or suspect that sales in the home market of the country of exportation ... ha[d] been made at prices which represente[d] less than the cost of producing the merchandise in question." 19 U.S.C. § 1677b(b). Commerce was, thus, required to "determine whether, in fact, such sales were made at less than the cost of producing the merchandise." *Id.* It may be permissible for Commerce in certain instances to allow a respondent to demonstrate its related supplier transfer prices are arm's length transactions by providing evidence of prices in the aggregate being higher than the unrelated suppliers' cost of production. Where, however, a respondent purports to make such a showing by providing Commerce with pricing information which shows the respondent purchased such a significant number of items [      ], it is incumbent upon Commerce to make further inquiry. This Commerce failed to do. Accordingly, the Court orders Commerce on remand to point to substantial evidence on the record in support of its determination that Nissan's

related party transfer prices were made at arm's length. If Commerce is unable to point to such evidence, the Court directs it to make any necessary adjustments.

## 2. Toyota

■ At verification, Toyota informed Commerce that Toyota's subsidiary, Toyota Industrial Equipment (TIE), paid a related supplier, Toyota Motor Distributor (TMD), a rate for parts based on TMD's published price list divided by [ ]. Conf.Doc. 113. When plaintiffs objected at the administrative level to the use of Toyota's transfer prices, Toyota responded that its U.S. subsidiary paid the same price that other distributors paid. R.Doc. 113 at 2853A. In its final results, Commerce stated TMD granted TIE a discount on the materials purchased from TMD. *Final Results,* 57 Fed.Reg. at 3168. Commerce concluded, however, "[s]ince it is reasonable to expect that a distributor would not pay the same price as a dealer, the Department accepted TIE's reported material costs as reasonable." *Id.*

Plaintiffs claim Commerce improperly calculated Toyota's value-added material costs. NACCO contends the record does not contain evidence that prices paid by unrelated distributors to TMD were the same as prices paid by TIE to TMD. Moreover, plaintiffs argue Commerce's conclusion regarding distributor's paying a lesser price than dealers is not supported by record evidence. Plaintiffs ask the Court to remand this issue for Commerce to increase the cost of materials reported by Toyota for parts purchased from TMD so they reflect the prices charged by TMD for sales of these parts to unrelated dealers.

Commerce claims its reliance on Toyota's material cost information was reasonable, because Commerce verified the information and examined Toyota's relationship with its suppliers. Commerce maintains it properly concluded the [ ] divisor represented the discount distributors receive from the dealer's price due to volume purchases. Toyota argues Commerce made a reasonable conclusion based on substantial evidence on the record that the purchase prices represented

the fair market value for these parts to distributors.

The Court holds there is not substantial evidence on the record to support Commerce's final results with respect to Toyota's transfer prices. The only record evidence Toyota and Commerce can point the Court to is a TMD dealer price list which has a handwritten notation of [ ]. Conf.Doc. 113. This minimal amount of evidence is not such relevant evidence as a reasonable mind might accept as adequate to support the conclusion Toyota's transfer prices were at arm's length. *See Matsushita Elec. Indus. Co. v. United States*, 3 Fed.Cir. (T) 44, 51, 750 F.2d 927, 933 (1984) (citations omitted). The Court, therefore, directs Commerce on remand to point to substantial evidence on the record in support of its determination that Toyota's transfer prices are at arm's length. If Commerce is unable to point to such evidence, the Court orders it to make any necessary adjustments.

### 3. Toyo

■ Plaintiffs argue Toyo failed to establish its purchases from related suppliers were arm's length transactions and Commerce's determination is thus not based on substantial evidence on the record. Plaintiffs seek a remand with directions to Commerce either to require Toyo to submit the information originally requested by Commerce or to use BIA.

Commerce maintains it properly calculated Toyo's value-added costs and plaintiffs' argument otherwise is without merit. Toyo contends Commerce properly determined an arm's length pricing analysis from Toyo's related suppliers would not be necessary because of Toyo's limited ownership interest in the suppliers and minimal cost accounted for by inputs purchased from them.

The Court holds plaintiffs argument is without merit. Based on substantial record evidence, Commerce determined Toyo's purchases from suppliers were at arm's length. Commerce properly based its decision not to require an arm's length analysis on the following: (1) Toyo's ownership interest in the related suppliers was less than [ ]; (2) the portion of total costs provided by the rele-

vant inputs was insignificant—[ ]; and (3) because more than [ ]. *See* Conf.Doc. 76 at 2463A; Rec.Doc. 364 at 1627; Rec.Doc. 260 at 1638–39; Conf.Doc. 5 at 159A–160A, 178A; Conf.Doc. 45 at 186A, 360A–378A.

### D. *Other Value–Added Costs*

■ Where an exporter makes alterations to its merchandise at facilities in the United States, any additional expenses incurred, value-added expenses, must be deducted from USP. 19 U.S.C. § 1677a(e)(3). Subsection (e)(3) provides the following:

> **(e) Additional adjustments to exporter's sales price.**—For purposes of this section, the exporter's sales price shall also be adjusted by being reduced by the amount, if any, of—
>
> ` . . . .`
>
> (3) any increased value, including additional material and labor, resulting from a process of manufacture or assembly performed on the imported merchandise after the importation of the merchandise and before its sale to a person who is not the exporter of the merchandise.

19 U.S.C. § 1677a(e)(3). Plaintiffs complain Commerce has failed to follow this statutory mandate and as a result has artificially reduced Nissan's and Toyota's dumping margins.

### 1. Nissan's U.S. Value–Added Costs

Plaintiffs contend Commerce improperly treated some of Nissan's value-added costs as indirect selling expenses. According to plaintiffs Commerce should have required Nissan to report the value-added portion of the work done at its Mansfield, Massachusetts facility which involved receiving and shipping, not selling, the forklifts. Additionally, plaintiffs argue Commerce erred in not requiring Nissan to submit its total value-added labor and overhead costs on a sale-by-sale basis as Toyo and Toyota did. Plaintiffs complain Commerce must rely on BIA if Nissan is unable to provide the data requested by Commerce. *See* 19 U.S.C. § 1677e(c).

Based on its practice of accepting respondents' reasonable accounting methodologies,

Commerce argues it properly treated expenses incurred by Nissan at its Mansfield facility as indirect selling expenses. Despite Commerce's preference for sale-by-sale reporting, it maintains it will use the respondent's own accounting methodology if, as was the case with Nissan's methodology, it is reasonable and does not distort costs.

Nissan contends Commerce did not err in its decision to treat expenses incurred at the Mansfield facility as indirect selling expenses. According to Nissan, "[d]ata regarding the value-added costs incurred by [Nissan's] Mansfield facility do not exist because of the manner in which that facility is independently managed and operated[.]" Nissan's Brief at 34–35. Furthermore, because the Mansfield facility performs some work on all Nissan forklift trucks, including those not within the scope of this administrative review, the only appropriate basis for allocating Nissan's total shop costs, Nissan maintains, is to allocate as Commerce did—over all of the trucks on which work was performed.

The Court holds Commerce has reasonably interpreted and applied the statute based on the information submitted by Nissan. *See ICC Indus.*, 5 Fed.Cir. (T) at 85, 812 F.2d at 699. Commerce was not required to resort to BIA pursuant to either 19 U.S.C. § 1677e(b) or (c). Commerce was able to verify the accuracy of the information Nissan submitted, therefore it would be inappropriate to base BIA on 19 U.S.C. § 1677e(b). *See Final Results*, 57 Fed.Reg. at 3175. Moreover, 19 U.S.C. § 1677e(c) is inapplicable because Commerce may not resort to BIA "where a submitter cannot produce data because such data never existed." *Olympic Adhesives, Inc. v. United States*, 8 Fed.Cir. (T) 69, 78, 899 F.2d 1565, 1573 (1990). Commerce acted reasonably in accepting Nissan's accounting methodology. Accordingly, plaintiffs argument regarding Nissan's U.S. value-added costs fails.

### 2. Toyota's Value–Added Labor Costs

■ In the final results, Commerce accepted Toyota's allocation of employee benefits expenses to overhead after finding "the allocation was reasonable because Toyota included fringe benefits in the value-added overhead." *Final Results*, 57 Fed.Reg. at 3168. Plaintiffs claim Commerce should have treated Toyota's employee benefit costs as direct labor costs. Plaintiffs charge Commerce has acted contrary to its longstanding practice of requiring respondents to include the cost of employee benefit programs in their direct labor costs.

While Commerce admits it normally treats employee benefits expenses as direct labor expenses, it contends it properly treated Toyota's fringe benefits expenses as overhead expenses because Toyota provided Commerce with a reliable, reasonable accounting methodology used in the normal course of business. Toyota argues Commerce correctly categorized its employee fringe benefits expenses. Moreover, because Commerce deducts both labor and overhead from USP, Toyota claims a recategorization of its employee fringe benefits would not change the value-added calculation.

While it would appear to the Court the better way of accounting for employee fringe benefits is to treat them as direct labor expenses, as Commerce concedes is its normal practice, the Court is unable to hold Commerce has acted unlawfully or abused its discretion in accepting Toyota's accounting methodology. *See Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), *quoted in Zenith Radio Corp. v. United States*, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978) ("[W]e need not find that [the agency's] construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.") (quotations and citations omitted); *ICC Indus.*, 5 Fed.Cir. (T) at 85, 812 F.2d at 699 ("An agency's 'interpretation of the statute need not be the *only* reasonable interpretation or the one which the court views as the most reasonable.'") (emphasis in original) (citation omitted). The Court sustains Commerce's treatment of Toyota's employee fringe benefits and dismisses plaintiffs' argument with respect to this issue.

### E. *Commerce's Decision Not To Verify Cost of Production Data*

■ Commerce initially scheduled cost of production verifications for Nissan and Toyo,

"but was forced to reevaluate the utility of these verifications after hostilities in the Persian Gulf curtailed the Department's verification activities." *Final Results,* 57 Fed.Reg. at 3177. Commerce determined Nissan's and Toyo's submissions were satisfactory and verification would be unnecessary "[g]iven that these verifications were not required, and in light of the successful verification of all other aspects of Nissan's and [Toyo's] sales[.]" *Id.*

Plaintiffs complain Commerce must reschedule the cost of production verification for Nissan and Toyo, because nothing has changed in the context of this review to alter the need to verify the information. According to plaintiffs, good cause exists for verifying the cost of production information due to Nissan's incomplete data and the fact Toyo's cost data has never been verified. Moreover, plaintiffs take exception to Commerce assuming the two respondents' cost data are reliable because Commerce found both respondents' sales data to be accurate.

Commerce argues it properly determined it was not necessary to verify Nissan's and Toyo's cost data because it had other indicia of reliability of this information. Commerce contends its initial decision, that good cause existed to verify, was superseded by the verification of all of Nissan's and Toyo's sales and United States cost of production data. Commerce refutes plaintiffs' argument of a lack of relationship between the sales data and cost of production data by arguing the parties themselves were shown to be reliable by the fact they submitted accurate sales data. Both Nissan and Toyo support Commerce's position.

Verification of information relied upon in making a determination is mandated where

(A) verification is timely requested by an interested party . . ., and

(B) no verification was made under this paragraph during the 2 immediately preceding reviews and determinations under that section of the same order, finding, or notice, except that this clause shall not apply if good cause for verification is shown.

19 U.S.C. § 1677e(b). *See also* 19 C.F.R. § 353.36 (1992). Neither of the situations in

which Commerce must conduct verification is present in this case. The first situation requires that an interested party request the verification and that there not have been verification in the two immediately preceding reviews. Although NACCO, an interested party, has requested Commerce to verify Nissan's and Toyo's cost of production data, this proceeding is only the first antidumping administrative review. Thus the second required element of the statute, that verification had not occurred during the two immediately preceding reviews, is not present.

Verification will also be required where Commerce has determined "good cause for verification is shown." Commerce initially determined good cause for verification existed as illustrated by the fact it scheduled verification for Nissan's and Toyo's cost of production data. However, at the time verification would have taken place, after the delay caused by the Persian Gulf War, Commerce reevaluated the situation to determine whether good cause for verification was still present. Commerce concluded good cause for verification at that time had not been shown, and was therefore unnecessary. The Court holds Commerce was within its discretion in making such a determination regarding the absence of good cause and rejects plaintiffs' arguments to the contrary.

### F. *Nissan's Home Market Rebates*

■ Plaintiffs claim Commerce has violated 19 C.F.R. § 353.56 (1992) by unlawfully granting Nissan an adjustment to FMV for the following home market rebates: [      ]. *See* CR 19 at B–7, B–9, B–11. Plaintiffs maintain the rebates are not indirect selling expenses and cannot be deducted from home market price. Plaintiffs ask the Court to remand the *Final Results* with respect to this issue for Commerce to eliminate any adjustment to FMV based on these rebates.

Commerce argues there is sufficient evidence to grant Nissan an adjustment for these rebates as indirect selling expenses because ["      "]. Defendant's Brief at 44. According to Nissan, the rebates are designed to support sales to end customers through the establishment and maintenance

of a strong dealer network. Nissan argues the rebates are related to the maintenance and improvement of Nissan's sales distribution system and are, therefore, properly treated as indirect selling expenses.

Plaintiffs claim Commerce has violated the following regulations:

(a) *In general.* (1) In calculating foreign market value, the Secretary will make a reasonable allowance for a *bona fide* difference in the circumstances of the sales compared.... In general, the Secretary will limit allowances to those circumstances which bear a direct relationship to the sales compared.

....

(b) *Special Rule....* (2) In comparisons with exporter's sales price, the Secretary will make a reasonable deduction from foreign market value for all expenses, other than those described in paragraph (a)(1) or (a)(2), incurred in selling such or similar merchandise....

19 C.F.R. § 353.56. Because Commerce treated the rebates at issue as indirect, not direct, selling expenses, 19 C.F.R. § 353.-56(a)(1) is inapplicable and plaintiffs' first argument fails. For their second argument, plaintiffs maintain Nissan's rebates are not expenses "incurred in selling such or similar merchandise." Plaintiffs, however, were unable to provide the Court with record evidence supporting their position that "[t]he sale of spare parts and the servicing of forklift trucks are separate operations and the expenses relating to those operations cannot lawfully be attributed to the sale of new forklift trucks." Pl.Br. at 42–43; *see also* Pl.Supp.Br. at 5. Plaintiffs were thus unable to demonstrate to the Court the Nissan rebates were not "incurred in selling such or similar merchandise." Absent such a demonstration, plaintiffs' argument fails and the Court sustains Commerce's determination with respect to Nissan's home market rebates.

G. *Errors in Toyo's Database*

■ Plaintiffs and defendant agree corrections to Toyo's database are necessary and request the Court remand the matter with respect to this issue. Accordingly, the Court remands this issue and orders Commerce to correct the errors in Toyo's database.

H. *Toyota's Labor and Product Liability Expenses*

Plaintiffs argue Toyota overstated its average hourly labor costs by failing to subtract the costs for hours paid, but not physically worked. According to plaintiffs, Toyota must base its hourly labor cost on the hours worked, not the hours paid. Additionally, plaintiffs contend Toyota's allocation methodology concerning product liability expenses was improper because it allocated unit costs for product liability insurance over a ten year period.

Commerce claims it verified Toyota properly accounted for its labor costs and product liability expenses and made appropriate adjustments to Toyota's USP. *See* 19 U.S.C. § 1677a. Commerce based its acceptance of Toyota's treatment of these expenses on its practice of accepting respondent's accounting methodologies which are reasonable and used in the normal course of business. In accepting Toyota's accounting methodology, Commerce maintains it acted reasonably and in accordance with law.

Toyota argues Commerce correctly calculated Toyota's USP with respect to value-added labor costs and product liability premiums. According to Toyota, because its workers "spend only a minor portion of their time on [value-added] activities, it is appropriate to attribute vacation time to overhead and selling expense, and to attribute to value-added activities only time related to value-added activities." Toyota Br. at 15.

Commerce verified Toyota's value-added labor costs and also "verified that the product liability expenses are reasonably allocated over all trucks currently in service by verifying all of Toyota's insurance documents for the period[.]" *Final Results,* 57 Fed. Reg. at 3170. The Court is unable to hold Commerce has acted unlawfully or abused its discretion in accepting Toyota's accounting methodology. *See Zenith,* 437 U.S. at 450, 98 S.Ct. at 2445; *ICC Indus.,* 5 Fed.Cir. (T) at 85, 812 F.2d at 699. The Court, therefore,

sustains the final results as they pertain to this issue.

## CONCLUSION

After considering all of plaintiffs', defendant's and defendant-intervenors' arguments, the Court makes the following holdings: (1) Commerce is not required to conduct a test of consumer tax incidence and its determination that the Japanese consumption tax was included in the price of defendant-intervenors' subject imports is based on substantial evidence on the record; (2) Commerce may not use a circumstance of sale adjustment to compute commodity tax adjustments, and therefore the Court remands this issue to Commerce for it to eliminate the use of 19 U.S.C. § 1677b(a)(4)(B) in accounting for the "multiplier effect," and to consider any further adjustments to USP consistent with *Zenith* and title 19; (3) Commerce's choice of model match methodology and "such or similar merchandise" determination is based on substantial evidence on the record and is otherwise in accordance with law; (4) there is not substantial evidence on the record to support Commerce's final results with respect to Nissan's transfer prices, and therefore, the Court directs Commerce on remand either to point to such evidence or, if it is unable to do so, to make any necessary adjustments; (5) there is not substantial evidence on the record to support Commerce's final results with respect to Toyota's transfer prices, and therefore, the Court directs Commerce on remand either to point to such evidence or, if it is unable to do so, to make any necessary adjustments; (6) Commerce properly determined Toyo's purchases from suppliers were at arm's length; (7) Commerce acted reasonably in accepting Nissan's accounting methodology regarding Nissan's U.S. value-added costs; (8) Commerce's treatment of Toyota's employee fringe benefits was in accordance with law; (9) Commerce was within its discretion in determining good cause for verification of Nissan's and Toyo's cost of production data did not exist; (10) Commerce's treatment of Nissan's home market rebates is based on substantial evidence on the record; (11) Commerce is ordered to correct the errors in Toyo's database; and (12) Commerce properly accounted for Toyota's value-added labor costs and product liability premiums.

Commerce's remand results are due April 11, 1994. Any comments or responses by the parties to the remand are due May 11, 1994, and shall be limited to fifteen pages. Any rebuttal comments are due May 26, 1994, and shall be limited to ten pages.

## ORDER

This case having been duly submitted for decision and this Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

**ORDERED** that the Department of Commerce's final results in *Certain Internal-Combustion, Industrial Forklift Trucks from Japan; Final Results of Antidumping Duty Administrative Review*, 57 Fed.Reg. 3167 (1992) are sustained in part and remanded in part; and it is further

**ORDERED** that Commerce may not use a circumstance of sale adjustment to compute commodity tax adjustments and, therefore, on remand must eliminate the use of 19 U.S.C. § 1677b(a)(4)(B) in accounting for the "multiplier effect," and must consider any further adjustments to USP consistent with *Zenith* and title 19 which it deems appropriate; and it is further

**ORDERED** that Commerce on remand must point to substantial evidence on the record in support of its determination that Nissan's related party transfer prices were arm's length, and if it is unable to point to such evidence, to make any necessary adjustments; and it is further

**ORDERED** that Commerce on remand must point to substantial evidence on the record in support of its determination that Toyota's related party transfer prices are arm's length, and if it is unable to point to such evidence, to make any necessary adjustments; and it is further

**ORDERED** that Commerce is directed on remand to correct the errors in Toyo's database; and it is further

**ORDERED** that remand results are due April 11, 1994. Any comments or responses

by the parties to the remand are due May 11, 1994, and shall be limited to fifteen pages. Any rebuttal comments are due May 26, 1994, and shall be limited to ten pages; and it is further

**ORDERED** that the *Final Results* are sustained in all other respects.