Slip Op. 02 - 77

# *UNITED STATES COURT OF INTERNATIONAL TRADE*

|  |  |  |
|---|---|---|
| CARPENTER TECHNOLOGY CORP., | : | |
| Plaintiff, | : | |
| v. | : | |
| THE UNITED STATES, | : | |
| Defendant. | : | **Before: MUSGRAVE, JUDGE** |
| | : | Consol. Court No. 00-09-00447 |
| VIRAJ IMPOEXPO LTD., | : | |
| Plaintiff, | : | |
| v. | : | |
| THE UNITED STATES | : | |
| Defendant. | : | |

[Antidumping duty review determination sustained in part, reversed and remanded in part.]

Decided: July 30, 2002

*Collier Shannon Scott, PLLC,* (*Robin H. Gilbert*), Washington, D.C., for the plaintiff Carpenter Technology Corporation.

*Miller & Chevalier* (*Peter Koenig*), Washington, D.C., for the plaintiff Viraj Impoexpo Ltd.

*Robert D. McCallum, Jr.*, Assistant Attorney General, *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Lucius Lau, Kenneth J. Guido*), for defendant The United States; (of counsel: *William G. Isasi*, Esq., U.S. Department of Commerce).

**OPINION**

Carpenter Technology Corporation ("Carpenter") and Viraj Impoexpo Ltd. ("Viraj") brought separate lawsuits to contest certain aspects of *Stainless Steel Bar From India: Final Results of Antidumping Duty Administrative Review and Initiation of Antidumping New Shipper Review*, 65 Fed. Reg. 48965 (Aug. 10, 2000) ("*Final Results*").[1] The *Final Results* utilize Viraj's reported data except for U.S. sales for which lacking corresponding third-country sales data, for which the office of International Trade Administration, U.S. Department of Commerce ("Commerce" or "the Department") utilized "facts otherwise available" to determine the margin of dumping. *See* 19 U.S.C. § 1677e. Carpenter contests Commerce's reversal of its preliminary determination that Viraj's questionnaire responses warranted an adverse inference and also its model matching methodology. Viraj contests Commerce's resort to facts available and also its choice thereof. Commerce contends the *Final Results* are correct.

### *Background*

Viraj's stainless steel bar entered the United States commerce subject to *Antidumping Duty Orders: Stainless Steel Bar from Brazil, India and Japan*, 60 Fed. Reg. 9661 (Feb. 25, 1995). The *Final Results* cover the period February 1, 1998 through January 31, 1999 ("POR") and were initiated on March 29, 1999.[2] Commerce sent to Viraj the department's standard questionnaire requesting *inter alia* information on the home market values of merchandise under review. *See* PDoc 950. The questionnaire referred a respondent to an attached Appendix III,

---

[1] The official public and confidential records are herein abbreviated "PDoc" and "CDoc", respectively.

[2] 64 Fed. Reg. 14860 (Mar. 29, 1999). The proceeding was later combined with a new shipper review. *See* 64 Fed. Reg. 18601 (Apr. 15, 1999).

which specified that hot rolled ("black") stainless steel bars as well as cold rolled ("bright") bars were reportable.

In its first response(s), dated June 3, 1999 and July 12, 1999, Viraj indicated that it had not made home market sales of certain merchandise under review and therefore it was providing only data on third country sales. PDocs 978, 1267. Specifically, in several places Viraj indicated that it was reporting sales of bright bars as the only merchandise under review that had been sold in the United States during the POR. Commerce therefore sent Viraj a supplemental questionnaire on August 17, 1999 requesting confirmation that Viraj had reported all home market sales of all merchandise under review as described in Appendix III of the initial questionnaire. *See* PDoc 1062. On September 23, 1999, Viraj confirmed that it had properly reported all sales of the merchandise under review in the United States, the home market, and third country markets. Viraj again stated that it was reporting "all sales of the subject merchandise as the total stainless steel bright bars activity." PDoc 1291.

Not convinced, Commerce therefore issued a second supplemental questionnaire on January 18, 2000. PDoc 1219. This instructed Viraj to "reconfirm that [it is] reporting all sales of stainless steel bars (*not just bright bars*) . . . to the United States, the home market, and to third countries" and set a deadline of February 1, 2000 for responding. *Id*. (at Fr. 2) (highlighting added). On January 24, 2000, Viraj requested an extension of time, which Commerce granted to February 8, 2000 with the caveat that in view of the pending deadline for the preliminary determination, no further extension of time would be granted. PDocs 1232, 1238. Viraj submitted data disclosing home market sales of black bar on February 8 and 9, 2000 (PDocs 1287, 1289), however it submitted the narration for the data on February 14, 2000.

Commerce rejected that submission as untimely and excluded it from the administrative record on February 17, 2000. *See* PDoc 1552.

On March 8, 2000, Commerce published the preliminary results *sub nom. Stainless Steel Bar From India; Preliminary Results of Antidumping Duty Administrative Review and New Shipper Review and Partial Rescission of Administrative Review*, 65 Fed. Reg. 12209 (Mar. 8, 2000). Commerce determined that because Viraj's last response was not timely, it had not responded to the best of its ability, it had therefore failed to cooperate, and it was therefore necessary to assign a margin based on total adverse facts otherwise available.[3] *Id.* at 12210. *See* 19 U.S.C. § 1677e. The preliminary margin was 21.02 percent.

On April 28, 2000, Viraj filed comments on the preliminary results. PDoc 1379. Viraj explained to Commerce that information provided by its counsel showed Commerce authorizing other respondents to exclude sales of black bar, and it thought that such exception applied to it because it had not sold black bar in the United States. Because the correspondence from Commerce to other parties indicated that black bar was fundamentally different from bright bar,

---

[3] According to the February 28, 2000 facts available memorandum:

> no description of any product characteristics was given; no answers to our questions about customer product codes, relationships, or channels of distribution were provided; no explanation of the invoicing system was offered; and no indication were [*sic*] given as to the basis for determining date and terms of payment. Furthermore, Viraj offered no explanation for why it did not provide credit expense data, variable cost of manufacturing data, or any selling expense information. Nor did Viraj provide any explanation as to why it did not provide a narrative response to questions regarding its policies relating to the use of discounts, rebates, and interest revenue.

PDoc 1329 at 4.

Viraj explained that it concluded that black bar was not a "foreign like product" or "comparable" to the only "subject merchandise" it had sold in the United States, *i.e.*, bright bar. Viraj stated that it had clearly explained in its earlier responses that it was only reporting sales of bright bar and never intended to mislead Commerce. It also explained that the narrative response to its second supplemental response was submitted after the deadline due to the short time available to respond and the time pressures on the one person capable of compiling the information for the response. Additionally, Viraj argued that even without the narrative the data were sufficiently complete to enable comparison to U.S. sales. *Id.*

In the final determination, Commerce again declined consideration of Viraj's home market data on the ground that the narrative response had not been submitted by the required deadline. Nonetheless, Commerce determined that Viraj's responses had been "due to confusion and not lack of cooperation" and therefore reversed its earlier conclusion that the circumstances warranted an adverse inference. Commerce then determined that Viraj's reported foreign-market sales were sufficiently complete to serve as a basis for comparison to U.S. sales. It grouped stainless steel bar by the physical characteristics of type (hot- or cold-rolled), grade, re-melting process, final finish, and shape. Because Commerce determined that Viraj did not report complete variable cost of manufacturing information, for size it "banded" the foreign market sales based on whether bar was above or below 20 millimeters, in accordance with Viraj's reported cost of manufacturing information. Commerce then matched sales, and for unmatched U.S. sales Commerce utilized as facts available the "all-others" rate of 12.45% established at the original less than fair value ("LTFV") investigation in 1994. *See Stainless Steel Bar From India,*

59 Fed. Reg. 66915 (Comment 1) (Dec. 28, 1994). This resulted in a weighted-average margin of dumping of 2.50 percent for Viraj during the POR. 65 Fed. Reg. at 48967-68 (Aug. 10, 2000).

### *Discussion*

Jurisdiction over this matter is pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) via 28 U.S.C. § 1581(c). The standard of review is whether "any [contested] determination, finding or conclusion" found by Commerce is "unsupported by substantial evidence on the record, or is otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *E.g.*, *Mitsubishi Heavy Indus. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) via *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)).

In an administrative review of an antidumping duty order, Commerce is required to determine the applicable antidumping duty margin, if any, for each entry of "subject merchandise." 19 U.S.C. § 1675(a)(2)(A). The margin is the difference between the "normal value" ("NV") and the "export price" ("EP") or "constructed export price" ("CEP") (as applicable) of the subject merchandise. 19 U.S.C. § 1677b(a). Subsection (1) of section 1677b(a) provides that the NV of such subject merchandise "shall" be a

> (B) Price
> . . . .
>    (i) . . . at which the foreign like product is first sold (or in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the [EP] or [CEP], or
>    (ii) in a case to which subparagraph (C) applies, the price at which the foreign like product is so sold (or offered for sale) for consumption in a country other than the exporting country or the United States, if—

(I) such price is representative,

(II) the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold by the exporter or producer in such other country is 5 percent or more of the aggregate quantity (or value) of the subject merchandise sold in the United States or for export to the United States, and

(III) [Commerce] does not determine that the particular market situation in such other country prevents a proper comparison with the export price or constructed export price.

(C) Third Country Sales
This subparagraph applies when—

(i) the foreign like product is not sold (or offered for sale) for consumption in the exporting country as described in subparagraph (B)(i),

(ii) [Commerce] determines that the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold in the exporting country is insufficient to permit a proper comparison with sales of the subject merchandise to the United States, or

(iii) the particular market situation in the exporting country does not permit a proper comparison with the [EP] or [CEP].

For purposes of clause (ii), the aggregate quantity (or value) of the foreign like product sold in the exporting country shall normally be considered to be insufficient if such quantity (or value) is less than 5 percent of the aggregate quantity (or value) of sales of the subject merchandise to the United States.

19 U.S.C. § 1677b(a)(1). If necessary information is missing from the administrative record, Commerce must make a determination on the basis of available information pursuant to 19 U.S.C. § 1677e, which provides in relevant part:

(a) In general
If—
(1) necessary information is not available on the record, or
(2) an interested party or any other person—
* * *
(B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,

[Commerce] . . . shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

(b) Adverse inferences

If the administering authority or the Commission (as the case may be) finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority or the Commission, the administering authority or the Commission (as the case may be), in reaching the applicable determination under this subtitle, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available. Such adverse inference may include reliance on information derived from--
(1) the petition,
(2) a final determination in the investigation under this subtitle,
(3) any previous review under section 1675 of this title or determination under section 1675b of this title, or
(4) any other information placed on the record.

19 U.S.C. § 1677e. *See also* 19 C.F.R. §§ 351.221, 351.308 (2000).

I

Carpenter contends the record lacks substantial evidence to support the determination that Viraj had acted to the best of its ability. It argues that Viraj, having participated in prior proceedings, was "well-acquainted" with departmental procedures and the contents of the agency's standard questionnaire, and it contends that Commerce violated departmental policy by not considering the three factors it generally considers in determining whether to apply adverse facts available: (1) the level of experience of the respondent in other investigations and orders; (2) whether the respondent has control of the data at issue; and (3) the extent to which the respondent may have benefitted from its own lack of cooperation. *See* Def.-Int.'s Br. at 19-26 (citing *inter alia Stainless Steel Sheet and Strip Coils from Taiwan*, 64 Fed. Reg. 30592 (June 8,

1999) (final LTFV determination); *Roller Chain Other Than Bicycle, From Japan*, 62 Fed. Reg. 60472, 60477 (Nov. 10, 1997) (final review results); *Certain Welded Carbon Steel Pipes and Tubes from Thailand*, 62 Fed. Reg. 53808, 53820-21 (Oct. 16, 1997) (final review results)). Carpenter argues for remand and consideration in accordance with Commerce's own policy.

Assuming *arguendo* that the foregoing amounts to administrative policy, the Court can discern nothing of record to justify remand for such consideration. The generic experience of a respondent in prior proceedings offers little, if any, insight into its actions during a particular proceeding. *Nippon Steel Corp. v. United States*, 25 CIT ___, ___, 146 F. Supp. 2d 835, 839 (2001). The second and third factors are predicated on finding a lack of cooperation. None has been determined, and there is no indication that Viraj intended to or did benefit from withholding information. Moreover, 19 U.S.C. § 1677e(b) is permissive in scope. *See Hoogovens Steel BV v. United States*, 24 CIT ___, ____, 86 F. Supp. 2d 1317, 1332 (2000). Therefore, even if Viraj had not acted to the best of its ability the law does not compel an adverse inference.

Of course, clear communication is prerequisite to avoiding confusion. *Cf.* 19 U.S.C. §§ 1677m(c) & 1677m(d). In this matter, Commerce sought the same information three times. But the apparent need for the second supplemental questionnaire would have been obviated had Commerce specifically requested confirmation in the first supplemental questionnaire of whether Viraj had reported all home market sales *including black bar*. On the other hand, the fact that Commerce sought confirmation *at all* (*i.e.*, whether all home market sales had been reported) should have acted as a red flag to Viraj regarding its reporting of home market sales.

The purposes of the antidumping laws are not furthered by erroneous assumption. Time is a precious commodity in these administrative proceedings. If a request from Commerce is unclear, it is incumbent upon parties to assist the administrative process and clarify the precise information sought. *See* 19 U.S.C. §§ 1675(a)(3)(A) & 1675(c)(5); *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1560 (Commerce is dependent upon the cooperation of respondents to provide necessary information in order to determine dumping margins "within the extremely short statutory deadlines which the Congress has built into the . . . antidumping law"); *Persico Pizzamiglio, S.A. v. United States*, 18 CIT 299, 304 (1994) ("any ambiguity should have been resolved through consultation with Commerce before the time . . . the response was due"); *Sugiyama Chain Co. v. United States*, 16 CIT 526, 531, 797 F. Supp. 989, 994 (1992) ("if the burden of compiling, checking, rechecking, and finding mistakes in [a] submission . . . were placed upon Commerce, it would transform the administrative process into a futility").

In any event, the standard of review is whether there is substantial record evidence to support the agency's determination that Viraj had acted to the best of its ability. There is, namely: (1) the letter from Commerce to counsel exempting Isibars from reporting black bar sales, on which Viraj claims to have relied, (2) the generality of the first supplemental questionnaire request, (3) Viraj's reiteration of its original response that it was reporting "all sales of the subject merchandise as the total stainless bright bars activity,"[4] and (4) Viraj's general diligence and responsiveness to Commerce's requests for information. *See* PDoc 1477 (Comment 4). *See also* PDocs 1219, 1379 at 2. Given the context, Commerce could reasonably conclude that Viraj had been confused as to its reporting requirements, and that even considering

---

[4] PDocs 1267, 1291 at 2.

the late narrative Viraj had been responsive. The determination that Viraj had acted to the best of its ability is therefore sustained. *See Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966) (the possibility of drawing inconsistent conclusions from the same "evidence does not prevent an agency's finding from being supported by substantial evidence"); *Inland Steel Industries, Inc. v. United States*, 188 F.3d 1349, 1359 (Fed. Cir. 1999) (reviewing courts do not weigh the evidence to determine whether a different conclusion is possible).

II

Viraj spends much of its brief criticizing Commerce's decision to reject the narrative as untimely and disregard the home market data and base normal values (NVs) on third country sales. At the same time, however, Viraj complains of being forced to respond to a six-page, single-spaced document in a mere two weeks, albeit with a one-week extension. The second supplemental questionnaire was a consequence of the nonspecific request in the first supplemental questionnaire to confirm that all home market sales had been reported, which Viraj contends was inadequate notice "of the nature of the deficiency" in accordance with 19 U.S.C. § 1677m(d), particularly in light of awareness of the exemption "granted" to other respondents from reporting black bar sales in the home market on the ground that they had sold only bright bar in the U.S. market. Viraj further contends that because its situation was the same as those other respondents, in light of their exemptions the reporting requirement imposed on it was arbitrary and capricious. Viraj's Br. at 5.

The judicial standard of review in a challenge such as this is whether the determination *on the record* is unsupported by substantial evidence or not in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B) (1995). Of course, an agency record that reveals an arbitrary or

capricious decision would not be in accordance with law, but that inquiry is narrower than the substantial evidence standard and asks whether there was a rational basis in fact for the decision. *Suwanee Steamship Co. v. United States*, C.D. 4708, 79 Cust.Ct. 19, 23-24, 435 F.Supp. 389, 392 (1977). If so, a court may not substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). *See, e.g.*, *Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 933-34 (1984) ("Commerce's decision to disregard margins caused solely by temporary fluctuations in the exchange rate, and to reach a Final Negative Determination, was reasonable and neither arbitrary nor in violation of law."); *Bowe Passat v. United States*, 17 CIT 335, 338 (1993) (decision to reject supplemental information arbitrary and capricious and an abuse of discretion). *See also* 5 U.S.C. § 706(2)(A).

As a general matter "it is Commerce, not the respondent, that determines what information is to be provided for an administrative review." *Ansaldo Componenti, S.p.A. v. United States*, 10 C.I.T. 28, 37, 628 F. Supp. 198, 205 (1986). The government here distinguishes Commerce's treatment of Viraj on the ground that those other respondents specifically requested an exemption whereas Viraj did not. But, of course, Commerce may neither abrogate its statutory mandate to inquire into all matters that may bear on the margin calculation nor engage in partiality. By exempting respondents with no sales of black bar in the United States from reporting home market sales of such, Commerce obviously concluded that home market black bar information was not necessary for calculating their NVs in accordance with 19 U.S.C. § 1677b(a)(1). Whether that decision was correct, Commerce was aware that Viraj had sold only bright bar in the U.S. market, and that circumstance necessarily superseded the mandate to use facts otherwise available "if an interested party or any other person . . . fails

to provide such information by the deadlines for submission of the information or in the form and manner requested" under 19 U.S.C. § 1677e(a)(2)(B).  Respondents have a right to expect fair, impartial, and consistent treatment in agency proceedings.  *See, e.g., NEC Corp. v. U.S. Dep't of Commerce*, 151 F.3d 1361 (1998); *Melamine Chemicals v. United States*, 732 F.3d 924, 933 (1984); *Torrington Co. v. United States*, 44 F.3d 1572, 1579 (1995).  It was incumbent upon Commerce to apply its rationale to all respondents similarly situated.

Be that as it may, in view of the fact that Viraj limited its initial response to third country sales data at the outset of the proceeding, it appears that Viraj's fundamental concern is the margin calculated on the basis of facts otherwise available, and that the basis of market data used to calculate NV is immaterial to Viraj.  The foregoing therefore appears to be academic.

III

A margin determination requires the identification of the "foreign like product" used for purposes of comparison.  *See* 19 U.S.C. § 1677(16).  In comparing the foreign and U.S. merchandise, if a difference in price is "established to the satisfaction of the administering authority to be wholly or partly due to . . . other differences in the circumstances of sale[,]" 19 U.S.C. § 1677b(a)(6)(C) authorizes Commerce to make a so-called difference in merchandise ("difmer") adjustment.  In considering any such adjustment, Commerce proceeds on the assumption that variable costs of manufacturing account for all differences in the physical characteristics of the products to be compared:

> In deciding what is a reasonable allowance for differences in physical characteristics, the Secretary will consider only differences in variable costs associated with the physical differences. Where appropriate, the Secretary may also consider differences in the market value. The

> Secretary will not consider differences in cost of production when compared merchandise has identical physical characteristics.

19 C.F.R. § 351.411 (1998). If the value of the difmer exceeds 20 percent of the total manufacturing costs (variable plus fixed costs), Commerce will presume that products are not comparable in the absence of circumstances that would make such difference reasonable. *See Antidumping Manual*, Ch. 8 at 49-52 (U.S. Dep't of Comm., Feb. 10, 1998); *see also Import Administration Policy Bulletin* 92.2 (U.S. Dep't of Comm., July 29, 1992).

Commerce concluded that Viraj provided total cost of manufacturing data but incomplete variable cost of manufacturing ("VCOM") data. Commerce therefore determined to resort to facts otherwise available for such VCOM data, and its method of accounting for such was to "band" (to use the parties' term) foreign-market and U.S.-export sales based on Viraj's representation that production processes differed between bar of less than 20 millimeters and bar greater than 20 millimeters. *See* CDoc 1266 at D-3; CDoc 1290 at D-14.

Carpenter believes size matters. It argues that there is a fundamental difference between banding sales and banding manufacturing costs, and that without VCOM data, third-country and U.S. sales could not be properly matched. The effect of the methodology, Carpenter contends, was to assign identical product matches irrespective of actual bar size:

> In cases where the Department has allowed averaging of cost data for VCOM, that decision only determined the magnitude of the DIFMER when a match between non-identical U.S. and foreign products occurs. Banding sales together by size range actually changes the manner by which sales are matched. Instead of seeking to match 15 mm prices in the U.S. to 15 mm prices in the third-country market, the Department has allowed a 15 mm product in the United States to match a 5, 8, 12, 16, or 19 mm product in the foreign market. Thus, the specific price differences are obviated and the most accurate possible measure of dumping is masked.

Def.-Int.'s Reply Br. at 7, 11. Thus, according to Carpenter, Commerce's method had the effect of masking differences in Viraj's cost of production and "rewarding" Viraj because Commerce could not make the requisite difmer adjustments.

The government responds that the question here is simply whether Commerce has reasonably met the requirements of 19 U.S.C. § 1677b(a)(6)(C) to account for the absence of VCOM information. It contends that Carpenter's argument assumes that Commerce's method is distorted without evidence thereof. Rather, according to the government, the data Viraj supplied enabled calculation of all legally-mandated adjustments to NV under 19 U.S.C. § 1677b(a)(6) (*e.g.*, inland freight, insurance, brokerage) and accounted for five out of the six physical characteristics that Commerce customarily uses in matching these products (type, grade, re-melting process, final finish, and shape). Def.'s Br. at 33. *See* CDoc 1266 at B8–B10. According to the government, the lack of precise VCOM information affected only the comparability of size, which impacted the "customary" adjustment for "any other differences." *See* 19 U.S.C. § 167b(a)(6)(C)(ii).

Commerce has implicit authority to develop and apply reasonable model-matching methodologies in order to determine a relevant "foreign like product" under 19 U.S.C. §§ 1677b and 1677(16), and its statutory interpretation thereof is entitled to *Chevron* deference.[5] *See, e.g., NTN Bearing Corp. v. United States*, 26 CIT ___, ___, 186 F. Supp. 2d 1257, 1302 (2002). *See also Koyo Seiko Co. v. United States*, 66 F.3d 1204, 1209-10 (Fed. Cir. 1995) ("Congress has implicitly delegated authority to Commerce to determine and apply a model-match methodology

_____

[5] *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984) ("if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute").

necessary to yield 'such or similar' merchandise"); *Timken v. United States*, 10 CIT 86, 98, 630 F. Supp. 1327, 1338 (1986). On the other hand, the methodology chosen must comport with law and the standards of substantial evidence and reasonableness. *See* 19 U.S.C. § 1516a; *see, e.g.*, *Allied Tube & Conduit Corp. v. United States*, 132 F. Supp. 2d 1087, 1096 (CIT 2001) (rejecting Commerce's unreasoned reliance on simple average in lieu of more accurate weighted average in non-adverse facts available context); *Mannesmannrohren-Werke AG et al. v. United States*, 24 CIT ___, ___, 120 F. Supp. 2d 1075, 1088-89 (2000) (Commerce's use of average facts available methodology upheld in absence of evidence that a more specific methodology would be more accurate); *Koenig & Bauer-Albert AG, et al. v. United States*, 22 CIT 574, 581-584, 15 F. Supp. 2d 834, 844-46 (1998) (Commerce's use of a facts otherwise available methodology upheld because the methodology bore a rational relationship to the subject matter at issue), *aff'd in part, rev'd on other grounds*, 259 F.3d 1341 (Fed. Cir. 2001); *Federal-Mogul Corp. et al. v. United States*, 18 CIT 785, 807-808, 862, F. Supp. 384, 400 (1994) (Commerce has discretion in the choice of methodology as long as the chosen methodology is reasonable and its conclusions are supported by substantial evidence on the record).

Carpenter's analysis demonstrates that Commerce's method matched more sales than would have been the result had resort to facts otherwise available occurred after a determination on model matching, but that analysis does not, in itself, demonstrate that Commerce's method was unreasonable and not in accordance with law. As above noted, a difmer adjustment is required to the extent that a difference in price is "established *to the satisfaction of* the administering authority to be wholly or partly due to . . . other differences in the circumstances of sale[.]" 19 U.S.C. § 1677b(a)(6)(C) (highlighting added). Carpenter's argument does not

effectively demonstrate that differences in VCOMs (assuming they exist) among the different individual sizes of stainless steel bar were of such magnitude that they would exceed the difmer test's twenty percent allowance before incomparability is presumed.  In other words, Carpenter's argument does not demonstrate that Commerce's method of accounting for the absence of VCOM information for matching purposes was *per se* unreasonable and therefore not in accordance with law.  *Cf. Koyo Seiko, supra*, 66 F.3d at 1208-11 (sum-of-deviations without ten percent cap model matching methodology sustained); *Makita Corp. v. United States*, 21 CIT 734, 974 F. Supp. 770, 779 (1997) (Commerce has authority to pool home market merchandise for matching purposes); *Federal-Mogul Corp. v. United States*, 20 C.I.T. 234, 248-49, 918 F. Supp. 386, 400 (1996); *Torrington Co. v. United States*, 19 CIT 403, 414, 881 F. Supp. 622, 635 (1995) (sustaining family model matching methodology); *Hussey Copper, Ltd. v. United States*, 17 CIT 993, 996, 834 F. Supp. 413, 417-18 (1993) (division of alloys into groups, difmer adjustments based on London Metal Exchange prices of copper and zinc for each grade within each group, and derivation of weighted-average group price as the basis for comparison, held to be in accordance with 19 U.S.C. 1677(16); exact alloy matching not required by statute).

On the other hand, Carpenter points out that the issues and decision memorandum states that Commerce undertook banding "in order to obtain more identical matches." PDoc 1466 at 13. This explanation appears results-oriented.  In *Hyster Co. v. United States*, 18 CIT 119, 127, 848 F. Supp. 178, 185-86 (1994), the court examined seemingly similar statements of Commerce[6]

---

[6] *See Hyster*, 18 CIT at 127, 848 F. Supp. at 185-86 ("Our main concern is that we find the most similar merchandise that is sold in commercial quantities in the home market[.] This approach appears to be a reasonable solution in that it simplifies the matching process and creates the likelihood of a greater number of matches") .

relating to an announced change in matching methodology but concluded that there were other factors putting those statements into perspective and were not *the* justification for the change in Commerce's model matching methodology. While an agency determination might be sustained despite "less than ideal clarity if the agency's path may be reasonably discerned[,]" *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974), the "path" here is cluttered by apparent disparate treatment between Viraj and Panchmahal, the latter, as Carpenter points out, having been required to provide for matching purposes cost data in *range* form and specific product sizes but penalized for not providing cost information to enable *exact*-size product matching. *See* Def.-Int.'s Br. at 11-12 (citing PDoc 1466 at 2-7 & CDoc. 1284). This Court therefore cannot conclude that the *Final Results* do not reflect a desire to produce a particular result, and the matter requires remand for clarification and, as necessary, reconcilation.

IV

Under prior law, when considering a non-adverse (or "second tier") facts otherwise available situation, Commerce would ordinarily use the higher of the original LTFV margin determined for the respondent's merchandise or the highest calculated margin during the review at issue for the same class or kind of merchandise. *See, e.g.*, *Koyo Seiko Co. v. United States*, 92 F.3d 1162, 1167 (Fed. Cir. 1996). In this proceeding, because Viraj was not a party to the original LTFV investigation, Commerce utilized as non-adverse facts otherwise available the LTFV all-others rate, a weighted-average of a verified margin of 3.87% found for Grand Foundry, a cooperative respondent, and a derived margin based on the petitioner's allegations of 21.02% determined against Mukand, an uncooperative respondent. Because that rate was based

on adverse inferences, Viraj argues that its use impermissibly perpetuated pre-URAA law[7] and

violated an international obligation of the United States.[8]

The government essentially argues that the URAA requires only prospective

determination of non-adverse all-others rates, a position it contends is in accordance with

judicial precedent that all-others rates are valid and unalterable until such time as they are

specifically invalidated.  Def's Br. at 23 (citing *Federal-Mogul Corp. et al. v. United States*, 17

CIT 442, 449, 822 F. Supp. 782, 788 (1993); *Federal-Mogul Corp. et al. v. United States*, 18

---

[7]  The underlying LTFV investigation was initiated on January 27, 1994 and decided on December 28, 1994.  *See* 59 Fed.Reg. 3844 and 59 Fed.Reg. 66915.  On January 1, 1995 section 219(b)(2) of the URAA went into effect:

> For purposes of preliminary and final LTFV determinations the estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* margins, and any margins determined entirely under section 1677e of this title.

19 U.S.C. § 1673d(c)(5)(A).  *See* 19 U.S.C. § 1677e.

[8]  Viraj's Br. at 3 (citing *Federal Mogul Corp. v. United States*, 93 F.3d 1572, 1581 (Fed. Cir. 1995) ("[S]tatutes should not be interpreted to conflict with international obligations.")).  Viraj notes that the URAA sought to bring U.S. law into compliance with the United States' WTO obligations, including the provision on permissible all-others rates. *See Ferro Union Inc. v. United States*, 23 CIT 178, 197, 44 F. Supp. 2d 1310, 1328 (1999).  Article 9.4 of the WTO Antidumping Duty Agreement, reflected in 19 U.S.C. § 1673d(c)(5)(A), states that

> any antidumping duty applied to imports from exporters or producers not included in the examination [*i.e.* an all-others rate] shall not exceed the weighted average dumping margin with respect to the selected exporters or producers. . . .  Provided that the authorities shall disregard for purposes of this paragraph any zero and *de minimis* margins established under the circumstances referred to in paragraph 8 or Article 6[, *i.e.*, margins based on adverse-inference facts otherwise available].

*See, e.g., United States Antidumping Measures on Certain Hot-Rolled Steel Products from Japan*, WTO Panel Report WT/DS184/R (Feb. 28, 2001).

CIT 785, 801, 862 F. Supp. 384, 400 (1994)).  *See also D&L Supply Co. v. United States*, 113

F.3d 1220, 1223 (Fed. Cir. 1997); *Pulton Chain Co. v. United States*, 21 CIT 1290, 1292 (1997).

Pre-URAA all-others rates have not been invalidated and are valid record information for use as

facts available, the government argues (irrespective of any adverse-inference basis), since

decisions of this Court (according to the government) regard all-others rates as non-adverse in

the context of unreviewed exporters.  Def.'s Br. at 23 (citing *The Coalition for the Preservation*

*of American Brake Drum and Rotor Aftermarket Manufacturers v. United States*, 23 CIT 88,

112, 44 F. Supp. 2d 229, 252 (1999); *Borden Inc. v. United States*, 22 CIT 233, 265, 4 F. Supp.

2d 1221, 1247 (1996) (if Commerce does not draw an adverse inference, it may apply a lower

rate, including an all-others rate)).  Therefore, the government argues, it is logical to regard a

pre-URAA all-others rate as non-adverse for purposes of facts otherwise available.  Further,

according to the government, all-others rates conform to the "common sense inference" that the

margins determined at the LTFV investigation are the most indicative of current market

conditions,[9] whereas taking Viraj's argument to its logical extreme "would prevent the

application of the all-others rate against non-reviewed exporters."  Def.'s Br. at 22.

However, *American Brake and Drum* and *Borden* each considered the application of an

all-others rate that had been determined after the URAA took effect.  They do not provide

guidance on the applicability of a pre-URAA rate based on adverse inferences to a cooperative

respondent reviewed post-URAA.  Likewise, *Allied Signal* interpreted Commerce's permissible

presumption under pre-URAA law and is not dispositive.  Commerce has authority to select

---

[9]  *Allied Signal v. United States*, 996 F.2d at 1192.  Commerce further states such presumption might have been overcome had Viraj simply provided the requested information within the deadlines established. *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990).

from among any "information or inferences which are reasonable under the circumstances as facts otherwise available for a cooperative respondent[.]"[10] But, the authority to utilize "any other information placed on the record"[11] as adverse facts otherwise available is restricted to respondents deemed uncooperative in accordance with 19 U.S.C. § 1677e(b), which Viraj was not. Post-URAA, it appears Commerce must, by definition, presume non-adversity in the case of a cooperative respondent, and the Court therefore concludes that an all-others rate based in whole or in part on adverse inferences cannot be said to constitute "non-adverse" facts otherwise available. The all-others rate was therefore an inappropriate choice of facts otherwise available and the matter will be remanded for further consideration.[12]

---

[10]   Statement of Administrative Action, H.R.Rep. No. 103-826(I) 656, 869 ("SAA"), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4198.

[11]   19 U.S.C. § 1677e(b)(4).

[12] Considering what would be appropriate facts otherwise available, there must be "a rational relationship between data chosen and the matter to which they are to apply." *Manifattura Emmepi S.p.A. v. United States*, 16 CIT 619, 624, 799 F. Supp. 110, 115 (1992). *See also National Steel Corp. v. United States*, 18 CIT 1126, 1132, 870 F. Supp. 1130, 1136 (1994). On that basis, the 1994 Grand Foundry rate would be a tenuous fit as facts otherwise available. Viraj argues that the zero percent margin determined against it in 1997 is more probative of its current market conditions than other information of record, and it contends that where Commerce is unable to calculate a margin for certain sales of a cooperative respondent, it has used as facts otherwise available a weighted-average margin based on acceptable sales from the respondent's own database. Viraj's Br. at 4 (citing *Static Random Access Memory From Taiwan*, 63 Fed. Reg. 8909, 8920 (Feb. 23, 1998) ("*SRAM*")). The government argues that *SRAM* was merely the initial LTFV investigation and thus "there was no higher rate from an earlier initial LTFV determination available for use." Def.'s Br. at 20. The Court fails to see the distinction. Rummaging among facts available for a "high" margin to use for a cooperative respondent would be *prima facie* results-oriented and in derogation of *Manifattura*'s rational relationship test if such is not probative. *Cf. Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1190 (Fed. Cir. 1990) (rejecting low margin information for demonstrably less probative high margin information would be punitive BIA). Commerce may use a cooperative respondent's own data if appropriate to do so. *See, e.g., Nippon Steel v. United States*, 25 CIT ___, n.6, 146 F. Supp. 2d 835, n.6 (2001); *Mannesmannrohren-Werke AG v. United States*, 24 CIT ___, ___, 120 F. Supp. 2d 1075, 1080-1081, 1088-89 (2000).

### *Conclusion*

In view of the foregoing, this matter will be remanded to Commerce for further proceedings not inconsistent with this opinion. Commerce shall have 60 days for re-determination, the parties shall have 30 days from the date thereof for commenting thereon, and 15 days thereafter for replies.

_____
R. KENTON MUSGRAVE, JUDGE

Dated: July 30, 2002
      New York, New York